## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Cr. Action No. 3:20-CR-46-1** |
| | § | |
| **MONROE MERRELL** | § | |
| | § | |
| | § | |

## MOTION TO STRIKE THE GOVERNMENT'S NOTICE OF INTENT TO SEEK THE DEATH PENALTY

### &

## MEMORANDUM OF LAW IN SUPPORT

The defendant, Monroe Merrell, moves this Court to strike the government's Notice of Intent to Seek the Death Penalty (ECF No. 415), filed on July 1, 2025. In support of this motion, Mr. Merrell submits the following memorandum of law.

## TABLE OF CONTENTS

I.    **Introduction**…………………………………………………………………..2

II.   **Background**…………………………………………………………….....3

    A.  The Alleged Offense Conduct …………………………………………………3

    B.  Relevant Events Between April 2020 and January 2025 …………………………4

    C.  Events Following President Trump's January 20, 2025
       Executive Order and Attorney General Bondi's
       February 5, 2025 Directive to Federal Prosecutors ……………………………….8

III.  **Legal Argument**…………………………………………………………..10

    A. Section 3593(a) Does Not Authorize a Reversal of Prior Decision by the
    Department of Justice Not to Seek the Death Penalty Reflected in a Formal
    Notice to the Court and Defendant………………………………….............10

B. This Court Should Strike the Government's July 1, 2025 Notice As Untimely.  …………………………………………………..………14

C. This Court Should Strike the Government's July 1, 2025 Notice Because "Good Cause" Does Not Exist for Its Filing…….…….…………33

D. The Government's January 2024 No-Seek Notice Affirmatively Waived the Government's Ability to File a Notice Under 18 U.S.C. § 3593(a)..……………………………………………………………36

E. The Government Is Estopped from Filing a Notice that It Intends To Seek the Death Penalty Under 18 U.S.C. § 3593(a)……………..…..37

F. Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause….…………………42

G. Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause………43

IV. Conclusion…………………………………………………………………44

## MEMORANDUM OF LAW

## I.
### Introduction

The government's July 1, 2025 notice of its intent to seek the death penalty was filed 17 months after formally informing this Court, Mr. Merrell, and his appointed counsel that the government would *not* seek the death penalty on January 25, 2024 (ECF No. 253) (hereafter called the prior "no-seek" notice) and only seven months before the existing date for a scheduled non-capital jury trial.  The July 1, 2025 notice is an affront to fundamental constitutional, statutory, and equitable principles.  As discussed below:

• The operative statute, 18 U.S.C. § 3593(a), does not permit the government to seek the death penalty after filing a prior formal notice that the government was *not* seeking the death penalty.  At the very least, as a matter of this Court's supervisory authority, it should prevent such a reversal.
• The government's notice is untimely.
• The government's notice, even if it were timely, is not supported by good cause.
• The government both *waived* its right to seek the death penalty and is *estopped* from seeking the death penalty under the circumstances of this case.

• Permitting the government to seek the death penalty would violate due process and the Eighth Amendment.

Just as the courts recently ruled in *United States v. Constanza-Galdomez*, ___ F. Supp.3d ___, 2025 WL 1712436 (D. Md. June 18, 2025),[1] and *United States v. Spurlock*, No. 3:23-cr-00022, ___ F. Supp.3d___, 2025 WL 1360499 (D. Nev. May 9, 2025)[2] – similar cases in which the government attempted to renege on its prior formal representation that it was *not* going to seek the death penalty[3] – this Court should strike the government's July 1, 2025 notice with prejudice.

## II.
## Background

### A.  The Alleged Offense Conduct

According to the allegations in the November 17, 2020 indictment, in March 2020 Mr. Merrell conspired with codefendants to kidnap, and ultimately did kidnap, a person identified as "J.R." with the intent to kill him, which culminated in J.R.'s death.  The indictment further alleged that, in April 2020, Mr. Merrell and codefendants also conspired to kill, and ultimately did intentionally kill, two people who had witnessed the alleged murder of J.R. – identified as "D.T." and "H.G."  *See* ECF No. 25, at 1-11.

---

[1] The government did not appeal the district court's order in *Constanza-Galdomez*.

[2] On May 12, 2025, the government appealed the district court's order in *Spurlock* to the Ninth Circuit (No. 25-3040), but on June 11, 2025, upon the government's motion, that appeal was voluntarily dismissed with prejudice.

[3] In *United States v. Martinez et al.*, No. 2:19-cr-00117-ODW (C.D. Cal.), the district court – when the prosecutors stated that they could not guarantee that the Department of Justice would not change it position after the November 2024 election – stated that it would not permit the government to renege on its formal notice that it would not seek the death penalty.  *See* No. 2:19-cr-00117-ODW (ECF No. 1248, at 12-13) (Aug. 12, 2024).  The court stated:

> I'm not going to permit something that unfair to take place in this court. . . .  I'm going to say this for the last time. You can't tell people that this form of punishment is off the table so that they can now sleep again and then change your mind and go, "It's back on again." No. . . . .

*Id.* at 12-13.  In *Martinez*, the prosecutor stated that he had conferred with the Capital Case Section of the Department of Justice and was informed that a reversal of a no-seek notice "ha[d] never happened before."  *Id.* at 8.

The most serious charged offenses – in violation of 18 U.S.C. §§ 1201 & 1512 – carry the death penalty as the maximum possible punishment upon conviction.  The indictment also alleges facts about Mr. Merrell's mental state at the time of the alleged offenses that, if proved, would render him statutorily eligible for the death penalty under 18 U.S.C. § 3591.  ECF No. 25, at 12. Finally, the indictment alleges certain statutory aggravating factors set forth in 18 U.S.C. § 3592(c): (1) the alleged murder of J.R. occurred during the commission of a kidnapping; (2) the alleged murders of J.R. and H.G. were committed in an especially heinous, cruel, depraved manner; (3) the alleged murders of the three victims were committed after substantial planning and premeditation; (4) Mr. Merrell intentionally killed or attempted to kill more than one person in a single criminal episode; and (5) Mr. Merrell used a firearm or knowingly directed, advised, authorized, and assisted another to use a firearm to threaten, intimidate, assault, or injure a witness (H.G.), in furtherance of a continuing criminal enterprise of which the offense was a part.  ECF No. 25, at 12-14.

### B.  Relevant Events Between April 2020 and January 2025

On April 15, 2020, Mr. Merrell was arrested in Virginia Beach, Virginia, on murder and kidnapping charges filed in state court in West Virginia.  In May 2020, he was extradited to West Virginia and detained in state custody there.

On July 15, 2020, the U.S. Attorney's office sent a target letter to Mr. Merrell, notifying him that he was being investigated for the alleged conduct later set forth in the indictment.  Based on that target letter, which referenced potential federal charges carrying the death penalty, this Court appointed two attorneys – Bernadette Donovan and Michael Santa Barbara – to represent Mr. Merrell.  ECF Nos. 2 & 3.  Ms. Donovan qualified as "learned counsel" under 18 U.S.C. §

3005.  Both Ms. Donovan and Mr. Santa Barbara eventually withdrew and were replaced with attorneys James Swetz and Douglas Sughrue.  ECF Nos. 12 & 353.

On October 21, 2020, a criminal complaint was filed against Mr. Merrell, alleging the same capital offenses eventually alleged in the indictment.  ECF No. 13.  On November 17, 2020, a federal grand jury returned the indictment.  ECF No. 25.  On December 8, 2020, Mr. Merrell made his initial appearance on the indictment, was arraigned, and was detained without bond.  ECF No. 68.

Based on procedural requirements set forth in the Department of Justice's *Justice Manual*, the U.S. Attorney's Office was required to notify the Department's Capital Case Section (CCS) in Washington, D.C., that the office was filing an indictment alleging capital offenses that potentially carried the death penalty.  JUSTICE MANUAL § 9-10.180 (2020 & current versions), available at: https://www.justice.gov/jm/jm-9-10000-capital-crimes#9-10.180.  According to the *Justice Manual*, the CCS, in consultation with the Attorney General, is responsible for determining whether the office should seek – or not seek – the death penalty.  Therefore, the U.S. Attorney's office communicated with the CCS from the outset of this federal prosecution in 2020 and followed the directions of the CCS concerning whether to seek the death penalty.

On March 27, 2023, Mr. Merrell's counsel made a presentation to the local U.S. Attorney's office, contending that the Department of Justice should not seek the death penalty.  Counsel subsequently made a similar presentation to the CCS in Washington, D.C. on November 13, 2023.  On January 25, 2024, the government filed a formal notice – "Notice of Intent Not to Seek the Death Penalty" – specifically stating that the Attorney General had "direct[ed] the Government not to seek the death penalty against Monroe Merrell . . . ." ECF No. 253.  The no-seek notice also informed this Court and the defense that "the matter is ripe for a . . . [non-capital] trial." *Id*

5

Although it took the CCS over three years from the filing of the indictment to reach the formal decision not to seek the death penalty, the Department of Justice during that time period was not authorizing the death penalty except in rare mass-murder cases involving terrorism or hate crimes.[4]  Therefore, at that time, Mr. Merrell then stood very little chance of facing the death penalty based on the emerging policy of the Department during the prior administration.[5]  The

---

[4] See David Nakamura, *Garland's Death-Penalty Record Will Soon Include Buffalo Killer Decision*, WASH. POST (Dec. 20, 2023), https://www.washingtonpost.com/national-security/2023/12/28/garland-buffalo-death-penalty-executions/ ("[Federal] [p]rosecutors this year took two death penalty cases Garland inherited to trial, while the attorney general has withdrawn the department's intent to seek capital punishment in 32 others that were also filed before he took office."), available at https://www.washingtonpost.com/national-security/2023/12/28/garland-buffalo-death-penalty-executions/ Hurubie Meko and Dan Higgins, *U.S. to Seek Death for Man Who Killed 10 in Racist Supermarket Massacre*, N.Y. TIMES, https://www.nytimes.com/2024/01/12/nyregion/payton-gendron-buffalo-death-penalty.html (Jan. 16, 2024) ("Federal prosecutors will seek the death penalty against the gunman who killed 10 Black people in a racist massacre at a Buffalo supermarket in May 2022, according to court papers filed on Friday. It is the first time that President Biden's administration has sought the death penalty in a new case.").

The January 2023 version of that portion of the *Justice Manual* – which has been rescinded by the current Administration – can be found here: https://crc.app.box.com/s/nq48m0othqjrytlpzuvtpsnqez9nxg6o/file/1780176090216.  In that version, the Department's policy was that: (1) "Priority should be given to crimes causing the most harm to the nation, including through widespread impact to the community" (§ 9-10.040(A)); and (2) "National consistency requires treating similar cases similarly when the only material difference is the location of the crime" (§ 9-10.030).  Thus, at the time, the defense had good reason to expect a no-seek decision in this case based on: (1) the fact that Mr. Merrell's alleged offenses did not cause "most harm to the nation"; and (2) DOJ's consistent pattern in 2022 and 2023 of no-seek decisions in dozens of other cases with allegations equal in gravity or even more grave than those against Mr. Merrell.

[5] On March 20, 2023, defense counsel for Mr. Merrell sent a letter to local prosecutors urging the government not to seek the death penalty.  **Exhibit A** (not including lengthy exhibits attached to that letter) (**filed under seal**).  Among other things, the letter stated that:

   • "[A]uthorization in this case would be inconsistent with the Department of Justice's ('DOJ') emphasis on crimes that harm the national community.  Second, authorization in this case would be disproportionate because defendants charged with similar or significantly more serious offenses have not been authorized by the current administration." (p. 5)

   • "[O]nly one capital case has proceeded to trial as a death penalty prosecution under the current administration, *United States v. Saipov*, CR 17-722 (S.D.N.Y.).  Sayfullo Saipov faced a capital prosecution for "the deadliest terrorist attack in New York City since 9/11," the 6 premeditated murder of eight persons in an alleged effort to join the Islamic State organization." (pp. 5-6)

   • "Monroe's authorization also would be disproportionate in light of the 417 capital defendants who have either been de-authorized or received initial no-seek decisions during the current administration." (p. 7)

   • "[T]he administration has declined authorization for at least twenty-one defendants who were charged with killing more than three people." (p. 8)

formal no-seek notice in January 2024 thus came as no surprise to either the U.S. Attorney's office or Mr. Merrell's defense counsel.

However, because the Department's position on the death penalty was not clear until early 2023 – when the provisions on the federal death penalty in the *Justice Manual* were revised in a manner that made it extremely unlikely that the death penalty would be sought in this case – Mr. Merrell's learned counsel and his court-appointed mitigation specialist, Donna Fessler, engaged in capital mitigation development beginning from the time of their appointment in mid-2020. Their work was done with the primary purpose of making mitigation presentations to the local U.S. Attorney's office and the Capital Review Committee (CRC) of the Department of Justice in Washington, D.C. However, their work up until the time of the January 2024's no-seek notice was by no means considered exhaustive – particularly considering the difference in scope between developing mitigation for presentation to the CRC and developing mitigation for presentation to a capital sentencing jury. *See* **Exhibit B** (Declaration of Bernadette Donovan, ¶ 11) (**filed under seal**) (stating "a substantial amount of capital mitigation development remained to be done" at that point); **Exhibit C** (Declaration of Donna Fessler, ¶ 11) (**filed under seal**) (same).

Furthermore, the capital mitigation developed by Donovan and Fessler was hampered by two factors – initially the COVID-19 pandemic (which was less of an impediment by mid-2022) and the fact that Mr. Merrell was incarcerated in detention facilities far away from his learned

---

• "Monroe's case would be a poor choice for this administration's first death penalty prosecution for two main reasons. First, despite the serious allegations in this case, authorization is not appropriate for this offense. Specifically, authorizing Monroe would create national disparities because the administration has declined to authorize thirty-five defendants who were charged were three or more murders, including twenty-one who were charged with more than three homicides. Notably, this list includes other persons charged with witness killings. Additionally, Monroe's case lacks the aspect of national harm that is emphasized by the Justice Manual's revised protocol." (p. 69)

*Id.*

counsel and mitigation specialist.  *See* ECF No. 202 (May 9, 2022 "Joint Status Report");[6]  *see also* **Exhibit B** (Declaration of Bernadette Donovan, ¶¶ 9 & 10); **Exhibit C** (Declaration of Donna Fessler, ¶¶ 5-6).

After the no-seek notice, the defense proceeded as if the death penalty were permanently off the table and thus discontinued any capital mitigation development or any other work related to a potential capital trial.  *See* **Exhibit B** (Declaration of Bernadette Donovan, ¶ 8); **Exhibit C** (Declaration of Donna Fessler, ¶ 10).  Such perceived permanence was consistent with how a formal no-seek notice had been applied in all federal death penalty cases before the new policy of the current leadership in the Department of Justice.

Because the government had formally represented that it would not seek the death penalty, Mr. Merrell's defense counsel also did not pursue plea negotiations in the same manner that they would have if the death penalty had remained a realistic possibility in their minds.  *See* **Exhibit B** (Declaration of Bernadette Donovan, ¶¶ 14 & 15).

On February 27, 2024, this Court scheduled a non-capital jury trial to commence on February 18, 2025. ECF No. 263.   This Court later rescheduled the trial to commence on February 2, 2026.  ECF No. 406.

---

[6] That Joint Status Report stated:

> . . . COVID-19 and related issues have significantly delayed the defendants' efforts to investigate both guilt/innocence and mitigation issues.  From the outset of this case, the COVID-19 pandemic has interfered greatly with client meetings, mitigation and fact interviews, records collection, and other aspects of defense preparation.  Since the last status report, COVID-19 has continued to affect defense preparations, but pandemic restrictions also have begun to ease. As the national COVID-19 status improves, the defense teams are making increased progress in their investigations.

ECF No. 202, at 1-2.

### C. Events Following President Trump's January 20, 2025 Executive Order and Attorney General Bondi's February 5, 2025 Directive to Federal Prosecutors

In the late spring of this year, this case took a dramatic turn when the government sought to renege on its prior formal representation that it would not seek the death penalty. After President Trump was sworn in on January 20, 2025 – following his election the prior November – he immediately issued an executive order, "Restoring the Death Penalty and Protecting Public Safety."[7] That executive order explicitly stated: "The Attorney General shall pursue the death penalty for all crimes of a severity demanding its use" and also stated that the Attorney General "shall pursu[e] the death penalty where possible."[8]

On February 4, 2025, Pam Bondi was confirmed by the Senate to be U.S. Attorney General. On February 5, 2025, Attorney General Bondi issued a memorandum to attorneys in the Department of Justice, "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions."[9] That memorandum stated that: "The Attorney General's Capital Review Committee is directed to review no-seek decisions in all pending capital-eligible cases (i.e., death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025."[10] Although the indictment in Mr. Merrell's case was filed before January 20, 2021, DOJ nevertheless decided to try to renege on DOJ's January 2024 no-seek order in his case.

On May 12, 2025, Mr. Merrell's defense counsel met with the Capital Review Committee in Washington, D.C., and urged it not to reverse the government's position. A copy of James

---

[7] That executive order is available at https://www.whitehouse.gov/presidential-actions/2025/01/restoring-the-death-penalty-and-protecting-public-safety/

[8] *Id.*

[9] That memorandum is available at: https://www.justice.gov/ag/media/1388561/dl?inline.

[10] *Id.*

Swetz's May 2, 2025 letter to the Capital Review Committee is attached as **Exhibit D** (**filed under seal**).[11]   On July 1, 2025, four-and-one-half years after the indictment was filed – and 17 months after the original no-seek notice – the government filed a notice of its intent to seek the death penalty against Mr. Merrell.  The notice was filed seven months before the date that a jury trial is scheduled to commence (February 2, 2026).

### III.
### Legal Argument

For several independent reasons, this Court should strike the government's notice of intent to seek the death penalty against Mr. Merrell with prejudice to refiling any additional such notice under 18 U.S.C. § 3593.

### A.  Section 3593(a) Does Not Authorize a Reversal of Prior Decision by the Department of Justice Not to Seek the Death Penalty Reflected in a Formal Notice to the Court and Defendant.

A federal statute, 18 U.S.C. § 3593(a), provides:

If, in a case involving an offense described in section 3591 [i.e., a federal offense carrying the death penalty as the maximum punishment], the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice –

(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a).

---

[11] That letter attached Bernadette Donovan's March 20, 2023 letter to the Capital Review Committee as an exhibit. Because that letter is already attached as **Exhibit A** to this motion, it is omitted from **Exhibit D**.

Section 3593(a) does not permit the government to reverse its prior formal decision *not* to seek the death penalty. *See Spurlock*, 2025 WL 1360499, at *21 ("[T]he Court agrees with Defendant that the [§ 3593(a)] must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so."); *see also United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing the requirement that two counsel – including one "learned counsel" – be appointed in a capital case under 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added).

The statute does not explicitly require formal notice of the government's decision *not* to seek the death penalty against a particular defendant whose charged conduct could support capital charges. Yet clearly the Department of Justice, as reflected in its *Justice Manual*,[12] believes such

---

[12] The *Justice Manual* provides that:

**9-10.030 - Purposes of the Capital Case Review Process**

The review of cases under this Chapter culminates in a decision to seek, ***or not to seek***, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. . . .

**9-10.040 - Consultation With the Capital Case Section**

Prior to seeking an indictment for an offense potentially punishable by death, the United States Attorney or Assistant Attorney General shall consult with the Capital Case Section. . . .

\*\*\*

**9-10.150 - Post-Decision Actions**

In any case in which the Attorney General has directed the filing of a notice of intention to seek the death penalty, the United States Attorney or Assistant Attorney General shall not file or amend the notice until the Capital Case Section has approved the notice or the proposed amendment. The notice of intention to seek the death penalty shall be filed as soon as possible after transmission of the Attorney General's decision to seek the death penalty.

The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the ***final decision*** [one way or the other]. Expeditious communication is necessary ***so that the court is aware***, ***in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek***

notice is implicitly required by § 3593(a) – in particular, in order to relieve district courts of their obligation to comply with the special requirements for appointed counsel in capital cases, as set forth in 18 U.S.C. § 3005, including the appointment of "learned counsel."[13]  In addition, the Department views this notice as the Attorney General's "final decision" with respect to her obligations under § 3593.  *See Justice Manual* § 10.150 ("The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made *the final decision*. Expeditious communication is necessary so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General *not* to seek the death penalty, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required.") (emphasis added).[14]

The statute's notice requirement is essential to the fair administration of the federal death penalty because of the interplay among 18 U.S.C. §§ 3005, 3593, and 3599.[15]  The potential for a death sentence creates multiple time-consuming and costly obligations on the part of the federal court system to administer – including locating learned counsel willing to be appointed, appointing

---

*the death penalty*, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required.  In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel should be given as much opportunity as possible to make proper scheduling decisions.

JUSTICE MANUAL §§ 9-10.030, 9-10.040 & 9-10.150 (emphasis added), available at: https://www.justice.gov/jm/jm-9-10000-capital-crimes#9-10.030

[13] In the Fourth Circuit – unlike every other circuit to have addressed the statute – a district court must maintain the appointment of two counsel (including one "learned counsel") even after the government has filed a no-seek notice. *See United States v. Boone*, 245 F.3d 352, 360-61 (4th Cir. 2001); *see also United States v. Shepperson*, 739 F.3d 176, 178 n.1 (4th Cir. 2014) ("Our interpretation of § 3005 is at odds with the view adopted by all our sister circuits to have considered the issue of whether the statute requires a second lawyer if the death penalty has been removed from consideration.") (citing cases from several circuits).  However, in such cases, the two counsel obviously do not continue to prepare for a capital trial after a no-seek notice filed by the prosecution.

[14] The phrase "final decision" appears multiple times in "Title 9" ("Capital Crimes") of the *Justice Manual*.

[15] Section 3599 governs the appointment of counsel, investigators, and experts in capital cases.

a mitigation specialist and other types of specialized experts for capital cases, and creating budgets for travel (e.g., to interview witnesses).  If a formal notice that the government is *not* seeking the death penalty can be withdrawn for any reason or no reason at all, then the federal judiciary loses its ability to fairly and efficiently administer the various statutory obligations and additional obligations created by the Judicial Conference of the U.S. Courts.  *See* GUIDE TO JUDICIARY POLICY (Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*).[16]

Although the statute permits an amendment of a prior notice of the government's intent to *seek* the death penalty based on "good cause,"[17] this Court should interpret it to prohibit an outright reversal of the government's previously filed formal notice that it would *not* seek the death penalty. Any question about what the statute requires or prohibits should be resolved in a defendant's favor under the rule of lenity (particularly when the death penalty is at issue).  *See McNally v. United States*, 483 U.S. 350, 359-360 (1987).  Therefore, the filing of the government's original notice in January 2024 forecloses the government's ability under § 3593(a) to seek the death penalty.  *See Spurlock*, 2025 WL 1360499, at *21.

For this reason, this Court should strike the government's July 1, 2025 notice – regardless of whether the government's notice is timely and supported by good cause (of which it is neither – issues discussed *infra*).

---

[16] Available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-17#:~:text=all%20capital%20cases.-,%C2%A7%20610.20%20Judicial%20Conference%20Recommendations,on%20the%20judiciary's%20public%20website.

[17] 18 U.S.C. § 3593(a)(2) ("The court may permit the attorney for the government to amend the notice upon a showing of good cause.").

At the very least, even if not required by the statute itself, this Court should hold – as a matter of this Court's supervisory authority[18] – that, once the government has filed a formal notice of its intent not to seek the death penalty, it may not thereafter seek the death penalty, at least when a defendant has detrimentally relied on the government's original notice that it was not seeking the death penalty (as Mr. Merrell has). That detrimental reliance is discussed *infra* in Part III.B.4.

### B. This Court Should Strike the Government's July 1, 2025 Notice as Untimely.

Assuming *arguendo* that § 3593(a) does not categorically prohibit a reversal of the government's formally announced decision *not* to seek the death penalty, this Court should strike the government's July 1, 2025 notice as untimely.

Section 3593(a) provides that the government must file notice of its intent to seek the death penalty "*a reasonable time before the trial or before acceptance by the court of a plea of guilty . . .*" 18 U.S.C. § 3593(a) (emphasis added). Section 3593(a) is "a prophylactic statute, one of the chief aims of which is to protect the accused from having to endure a trial for his life for which he was not on reasonable notice, [which requires] inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the defense." *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003). Thus, a district court must conduct "a pretrial inquiry into the objective reasonableness of the [timeliness of the] notice provided." *Id*. at 731. A notice of intent to seek the death penalty that is filed in an "objectively unreasonable" manner with respect to the scheduled trial date must be stricken with prejudice. *Id.*

---

[18] *See Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, (1987) (noting that "the exercise of supervisory authority is especially appropriate in the determination of the procedures to be employed by courts" that "directly concern[] the functioning of the Judiciary"). Significantly, Mr. Merrell is asking this Court to create a procedural rule related to the proper functioning of the federal judiciary in federal capital cases. He is not asking this Court to create a substantive or evidentiary rule. His proposed rule would only prohibit the death penalty when the government previously disclaimed an intent to seek it in a formal filing.

The key holdings of the Fourth Circuit's decision in *Ferebe* concerning the timeliness requirement are as follows:

> • "[E]valuation of the following factors, among others that may appear relevant, is necessary in order to assess the reasonable timeliness of a Death Notice: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings." *Id.* at 737 (internal footnote omitted).[19]

> • The existing trial date – and not a potential future trial date, if a motion for continuance were to be granted – is the key date for purposes of the timeliness analysis. *Ferebe*, 332 F.3d at 739; *see also id.* at 737 n.60. For that reason, the government's giving notice of its intent to seek the death penalty cannot serve as the basis for a continuance of the trial date. That is, an untimely notice cannot be rescued by delaying the existing trial date.[20]

> • Whether a defendant has been actually prejudiced as a result of an untimely notice of the government's intent to seek the death penalty is irrelevant. *Ferebe*, 332 F.2d at 732.

Applying the four *Ferebe* timeliness factors in Mr. Merrell's case and considering other relevant facts and circumstances demonstrates that the government's July 1, 2025 notice was untimely and, thus, must be stricken.

## 1. Nature of the Charges

This factor strongly favors Mr. Merrell. As an initial matter, the charges are complex – involving *three* different alleged murders at three different locations. There will be several dozen prosecution witnesses at trial. Indeed, before the government's July 1, 2025 notice (when the government still considered it to be a noncapital case), the government listed 73 prosecution

---

[19] The four enumerated factors are a "non-exhaustive list of factors" for courts to consider, and no single factor is dispositive. *United States v. Breeden*, 366 F.3d 369, 374 (4th Cir. 2004).

[20] *See also United States v. Hatten*, 276 F. Supp.2d 574, 579 (S.D. W.Va. 2003) ("[T]he Court must look at the trial date that was in existence at the time of [the] filing, even though the issuance of the Death Notice may affect the viability of the trial date."); *United States v. Ponder*, 347 F. Supp. 2d 256, 267 (E.D. Va. 2004) ("[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is *per se* unreasonable.").

witnesses and reserved its right to call even more witnesses.  ECF No. 328 (filed October 29, 2024).

As important, this aspect of the *Ferebe* analysis requires this Court to "'examine[] whether the Government should have filed the Death Notice earlier than it did given the nature of the charges in the indictment and the status of the discovery and inspection process.'" *Constanza-Galdomez*, 2025 WL 1712436, at *6 (quoting *United States v. Hatten*, 276 F. Supp. 2d 574, 264 (S.D.W. Va. 2003)).  In that regard, the government has been well aware of the relevant facts supporting a potential death penalty prosecution since the fall of 2020, when the criminal complaint and indictment were filed.  Yet it chose not to give notice of intent to seek the death penalty until four-and-one-half years later.

## 2. Nature of the Aggravating Factors

This factor also favors Mr. Merrell.  The government's July 1, 2025 notice includes the following aggravating factors that were not included in the indictment:

### [Concerning the Alleged Murder of J.R.]

1. **Destruction of Evidence**: After MONROE MERRELL killed J.R., he burned J.R.'s body to obstruct justice through the destruction of evidence.

2. **Desecration of Human Remains**: After MONROE MERRELL killed J.R., he participated in dowsing his body in gasoline and lit it on fire, thereby abusing human remains.

3. **Future Dangerousness of the Defendant**: MONROE MERRELL represents a continuing danger to the lives and safety of other persons. MONROE MERRELL is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a. **Continuing Pattern of Violence**: MONROE MERRELL has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including, at least, his conduct in pre-trial detention, the crimes charged against him in the Indictment, and the crime of which he was previously

convicted, to wit: kidnapping, in the Circuit Court of Carroll County, Maryland, on August 22, 2016, in case number 06K16047580.

b. **Lack of Remorse**: MONROE MERRELL has demonstrated a lack of remorse for the capital offenses committed in the case, as indicated by his statements and actions during and following the offenses alleged in the Indictment, including his actions in pre-trial detention.

c. **Low Rehabilitative Potential**: MONROE MERRELL has demonstrated a low potential for rehabilitation as evidenced by his longstanding involvement in criminal activities before the capital offenses charged in the Indictment, and afterward, including his misconduct in pre-trial detention. 4. Victim Impact Evidence: MONROE MERRELL caused injury, harm, and loss to the family and friends of J.R. The injury, harm, and loss caused by MONROE MERRELL with respect to J.R. is evidenced by his personal characteristics and by the impact of his death upon his family and friends.

### [Concerning the Alleged Murders of D.T. and H.G.]

1. **Obstruction of Justice**: MONROE MERRELL participated in killing D.T. and H.G. in an effort to prevent their testimony in an official proceeding and to prevent their communication to law enforcement officers of information relating to the commission of federal or state offenses.

2. **Destruction of Evidence**: After MONROE MERRELL participated in killing D.T. and H.G., he burned their bodies to obstruct justice through the destruction of evidence.

3. **Desecration of Human Remains**: After MONROE MERRELL participated in killing D.T. and H.G., he burned their bodies, thereby abusing human remains. 4. Future Dangerousness of the Defendant: MONROE MERRELL represents a continuing danger to the lives and safety of other persons. MONROE MERRELL is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a. **Continuing pattern of violence**: MONROE MERRELL has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including, at least, his conduct in pre-trial detention, the crimes charged against him in the Indictment, and the crime of which he was previously convicted, to wit: kidnapping, in the Circuit Court of Carroll County, Maryland, on August 22, 2016, in case number 06K16047580.

b. **Lack of Remorse**: MONROE MERRELL has demonstrated a lack of remorse for the capital offenses committed in the case, as indicated by his statements and actions during and following the offenses alleged in the Indictment, and afterwards, including his conduct on pre-trial detention.

c. **Low Rehabilitative Potential**: MONROE MERRELL has demonstrated a low potential for rehabilitation as evidenced by his longstanding involvement in criminal activities leading up to the capital offenses charged in the Indictment and including his misconduct on pre-trial detention. 5. Drugging the Victims: MONROE MERRELL participated in surreptitiously administering methadone and suboxone to D.T. and H.G. with the intent to kill them or, at a minimum, diminish their defenses and facilitate their murders by other means.

6. **Sexual Assault of the Victim**: Immediately prior to H.G.'s murder, MONROE MERRELL engaged in a sexual act with her, though she was incapable of appraising the nature of the conduct.

7. **Victim Impact Evidence**: MONROE MERRELL caused injury, harm, and loss to the family and friends of D.T. The injury, harm, and loss caused by MONROE MERRELL with respect to D.T. is evidenced by her personal characteristics and by the impact of her death upon her family and friends.

8. **Victim Impact Evidence**: MONROE MERRELL caused injury, harm, and loss to the family and friends of H.G. The injury, harm, and loss caused by MONROE MERRELL with respect to H.G. is evidenced by her personal characteristics and by the impact of her death upon her family and friends.

ECF No. 415, at 3-7.

For purposes of *Ferebe*, the two most significant of these newly pled aggravating factors are the "future dangerousness" factor and the "victim impact" factor. The former factor potentially encompasses an extremely wide array of alleged misconduct by Mr. Merrell going back for a decade or more. The latter factor relates to all three victims and potentially encompasses decades of their lives. To properly investigate and defend against such factors, the defense team would be required to devote very significant time and resources – *in addition to* spending a substantial amount of time and resources as they continue to develop mitigating evidence (as discussed *infra*).

Just as developing capital mitigating evidence takes substantial time, so does preparing for a defense against the prosecution's aggravating factors. *See United States v. Le*, 316 F. Supp.2d 343, 353 (E.D. Va. 2004) ("To effectively prepare for any potential sentencing hearing and to

refute these new allegations [about future dangerousness], defense counsel will need to investigate these allegations thoroughly.").

As the American Bar Association's guidelines for capital defense counsel provide :

[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that . . . rebuts the prosecution's case in aggravation. . . .  Trial counsel should determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof. . . .  Counsel should . . . thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut. . . .  If the prosecutor seeks to introduce evidence of unadjudicated prior criminal conduct as aggravating evidence, counsel should fully investigate the circumstances of the prior conduct and determine whether it is properly admissible at the penalty stage.

American Bar Association (ABA), GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA's *Guidelines*") *reprinted in* 31 HOFSTRA L. REV. 913, 1055, 1057, 1066 (2003).[21]

### 3.  Time Remaining Before Trial

At the time that the government filed its July 1, 2025 notice, there was only seven months remaining before the February 2, 2026 trial date.  The question with respect to this *Ferebe* factor is whether seven months is sufficient to permit for an adequate defense at a capital murder trial under the specific circumstances in the present case.  Based on what has occurred in the present case, the answer is clearly not.

---

[21] Both the Fourth Circuit and Supreme Court have looked to the ABA's *Guidelines* in determining whether a capital defense attorney provided ineffective assistance of counsel.  *See, e.g.*, *Williams v. Stirling*, 914 F.3d 302, 313 (4th Cir. 2019) (citing ABA's *Guidelines* and *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  In addition, the Judicial Conference of the United States Courts has recommended that: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Guidelines 1.1 and 10.2 et seq.) and the *2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*." GUIDE TO JUDICIARY POLICY, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act*, XIV.B.10, at 26-27, available at: https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-2.pdf.

As an initial matter, to gauge the amount of time that a capital defendant typically requires to prepare adequately for a federal capital trial, this Court should consider the average amount of time between the government's notice of its intent to seek the penalty and the commencement of a capital trial in the past two decades.   During the past two decades, the average time between the authorization of a capital prosecution by the Attorney General and the start of a capital trial has been *28 months*.   **Exhibit E** (declaration of Matthew Rubenstein, a Capital Resource Counsel attorney with the Federal Capital Trial Project, which is funded and administered by the Administrative Office of the U.S. Courts).   Although before the government's January 2024 no-seek notice, significant preparation for a capital trial had occurred – in the form of mitigation development – such preparation immediately ceased when the no-seek notice was given.   Between January 25, 2024, and July 1, 2025, relying to their detriment on their belief that the death penalty as off the table, the defense engaged in no additional preparation for a capital trial.   **Exhibit C** (declaration of Donna Fessler, ¶¶ 3, 7 & 8); **Exhibit F** (declaration of James Swetz, ¶¶ 13, 20 & 22).   Although Mr. Merrell's current defense team has not been required to start from scratch in terms of preparing for a capital trial, it is not as if they can just pick back up from the point at which the case was converted from a capital to a non-capital case in January 2024.

As explained in Donna Fessler's declaration:

> If Mr. Merrell's case moves forward as a death penalty case, I will not simply be able to pick up where I left off with the mitigation work over a year-and-a-half ago. I will first have to locate and re-establish contact with all mitigation witnesses who I had previously interviewed, who might be called as trial witnesses.  Each of those witnesses – which number at least 35 – will need to be re-interviewed at least one time in an in-person, face-to-face interview. ██████████████████████████████████████████████████████████████████████████████████████████████

> I will also need to review, in depth, mitigation records that were received after January 2024, and I will need to resume frequent, regular visits to Mr. Merrell to continue to work with him on developing mitigation evidence.

**Exhibit C** (declaration of Donna Fessler, ¶¶ 9 & 10); *see also* **Exhibit G** (declaration of Susan Garvey ¶¶ 3 & 33-39) (**filed under seal**).

Furthermore, an extensive amount of capital mitigation development – work not done before January 25, 2024 – remains to be done before the defense team will be adequately prepared for a capital trial.   As also explained in Fessler's declaration:

> When we received the government's no-seek notice in January 2024, there was substantial mitigation work remaining to be done in Mr. Merrell's case, and that work will also need to be completed prior to a capital trial.  For example, there were at least 45 known potential mitigation witnesses who had not yet been interviewed.  That number is likely to increase as more mitigation work is done, as records and witness interviews tend to reveal additional sources of mitigation witnesses and information.  Likewise, there are numerous records that still need to be collected and reviewed that may contain additional sources of mitigating evidence.

**Exhibit C** (declaration of Donna Fessler, ¶ 11).

The remaining time for preparation for a death penalty trial – seven months as of July 1, 2025 – would be inadequate in view of the "highly specialized and demanding litigation"[22] involved in a death penalty case.  With respect to the capital sentencing phase, the *Guidelines* provide that *extensive* mitigation development must be done:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."  At least in the case of the client, this begins with the moment of conception.

---

[22] GUIDE TO JUDICIARY POLICY, Vol. 7, DEFENDER SERVICES, PART A, GUIDELINES FOR ADMINISTERING THE CJA AND RELATED STATUTES, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, § 620.30(b)(1) ("Procedures for Appointment of Counsel in Federal Death Penalty Cases").

ABA Guideline 10.7, *reprinted in* 31 HOFSTRA L. REV. 913, 1022 (2003). The ABA's 2008 *Supplemental Guidelines* in detail set forth the inordinate amount of work required to prepare for a capital sentencing phase.[23]

---

[23] The *Supplemental Guidelines* provide, in particular, that:

The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

. . . Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

. . . Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

. . . It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:

1. Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:
    a. Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.
    b. Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.
    c. Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.
    d. Persons with specialized knowledge of institutional life, either generally or within a specific institution.

2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:

Furthermore, by abruptly seeking to transform this case back to a capital case after its treatment as a noncapital case for 17 months, the government also has forced the defense to reassess its approach since the no-seek notice filed on January 25, 2024 in preparing for the guilt-innocence phase.  As the ABA's guidelines explain:

> Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case.  In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated.  The client

---

a. The client's family, extending at least three generations back, and those familiar with the client;

b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;

c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;

d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;

e. Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;

f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

g. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

. . . It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.

. . . It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

ABA, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, *reprinted in* 36 HOFSTRA L. REV. 677, 689-92 (2008).

is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced.  Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages.  Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.

ABA Guideline 10.10.1 ("Trial Preparation Overall") (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1047-48.

It also is very relevant in this Court's timeliness analysis that Mr. Merrell's current "learned counsel," James Swetz, joined the defense team in November 2024 after former learned counsel, Bernadette Donovan, withdrew because of a conflict of interest.  ECF No. 368.  However, Mr. Swetz did not assume *capital defense* duties until the July 1, 2025 notice.[24]  In order to adequately represent Mr. Merrell in a potential death penalty case, Mr. Swetz must review all of the capital mitigation developed when Ms. Donovan was learned counsel in addition to needing to develop the remaining mitigation that was not developed before the no-seek notice filed on January 25, 2024 (and otherwise prepare for a capital trial).  **Exhibit F** (declaration of James Swetz, ¶ 22) ("As replacement Learned Counsel, I cannot fulfill my responsibilities by simply accepting whatever investigation has been done in the past without making an independent evaluation of the themes, witnesses, records and other information available about Mr. Merrell and his family. . . . [A]s replacement Learned Counsel and considering the interruption of the original investigation, I must consider the investigation in this case to be tantamount to a new mitigation investigation if I am to

---

[24] Mr. Swetz was appointed to replace Ms. Donovan at a time when the government's no-seek notice was still in effect. Such an appointment was required because, as noted above, the Fourth Circuit requires two counsel (including one learned counsel) under 18 U.S.C. § 3005 in a case with an offense carrying the death penalty as a maximum sentence even if the government has filed a no-seek notice.  However, between the no-seek notice and the government's July 1, 2025 notice, neither Ms. Donovan nor Mr. Swetz treated the case as a death penalty case.

fulfill the duties expected of me.").  In other words, Mr. Swetz is not in the position to "hit the ground running" with respect to preparing for a capital trial scheduled to begin on February 2, 2026.

Finally, it is worth noting another-time consuming task required before a death penalty trial can occur: preparing questionnaires for prospective jurors, sending them to prospective jurors, and then analyzing them before individual *voir dire.*  That process – which typically takes several weeks – obviously has not yet begun and would consume even more of defense counsel's (and this Court's) time.  *See United States v. Ferebe*, No. Crim L-97-0329, 2005 WL 1429261, at *7 (D. Md. June 16, 2005) (considering the lack of time to complete capital juror questionnaires to be a factor making the government's notice of its intent to seek the death penalty untimely).

### 4.  Status of Discovery

Beginning on January 6, 2021, and continuing through May 23, 2025, the government made 15 different discovery productions.  *See, e.g.*, ECF Nos. 85 & 401.  That discovery includes an enormous amount of material – 171.14 gigabytes of documents, social media posts, emails, texts, and images, and 1.15 terabytes of audio-files, video-files, and extractions from digital devices. Although the government has provided extensive discovery related to the *guilt-innocence phase*, no discovery related to "victim impact" or "future dangerousness" aggravating factors set forth in the July 1, 2025 notice has been provided as of the date that this motion is being filed.  That failure favors striking the government's July 1, 2025 notice.  *See Constanza-Galdomez*, 2025 WL 1712436, at *9 ("[T]his Court is far more troubled by the government's failure to produce any evidence relating to the sentencing phase. In particular, the government cites to 'victim impact' as an aggravating factor, but has not provided any clarity or evidence regarding what the victim impact is."); *see also Ferebe*, 2005 WL 1429261, at *7.

25

In addition, if there will be a death penalty trial, Mr. Merrell's counsel must again review the enormous production of discovery related to the guilt-innocence phase to determine its relevance through the specialized lens of capital defense counsel (which differs from the lens of a noncapital counsel). *See Constanza-Galdomez*, 2025 WL 1712436, at *9 ("Further, the guilt phase of a death-penalty trial provides a critical baseline for a possible later sentencing phase. To prepare for a death penalty trial, counsel would have to essentially redo their review of all of the previously produced evidence, with an eye towards bolstering mitigation arguments and defusing aggravating factors."); *see also* ABA Guideline 10.10.1 ("Trial Preparation Overall") (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1047-48 (noting the need for defense counsel to treat the guilt-innocence phase of a death penalty trial differently from the guilt-innocence phase of a non-capital trial).

***

For all these reasons, the seven-month period from July 1, 2025, to February 2, 2026, clearly is not an "objectively reasonable" time period in which Mr. Merrell and his defense team can adequately prepare for a death penalty trial.

### 5. Mr. Merrell Would Be Actually and Presumptively Prejudiced if the July 1, 2025 Notice Is Not Stricken.

In *Ferebe*, the majority of the Fourth Circuit – rejecting a dissenting judge's argument – held that its analysis of whether the government's notice under § 3593(a) was properly filed should not consider if the notice caused "prejudice" to the defendant. *See Ferebe*, 332 F.3d at 732. Although *Ferebe* does not require a showing of prejudice, Mr. Merrell nevertheless can show significant prejudice at this juncture.

#### a. Actual Prejudice

Regarding actual prejudice, during the 17-month period between the government's January 25, 2024 no-seek notice and its July 1, 2025 notice of its intent to seek the death penalty, Mr.

Merrell's defense team did not prepare for a capital trial. They thus lost precious time in which to develop capital mitigation. There is no way to know with certainty about all the lost opportunities to develop mitigation during that time period, but we do know with certainty that at least some compelling mitigation has been *permanently* lost because of the delay. According to the declaration of Donna Fessler, the defense team's mitigation specialist, two defense witnesses have become unavailable since the time that the no-seek notice was filed:

> . . . [M]y ability to develop evidence of the mitigating circumstances described above has been significantly hindered due to the loss of two witnesses since January 2024. Those witnesses are:





**Exhibit C** (declaration of Donna Fessler, ¶ 13).

Susan Garvey, an experienced mitigation specialist who has worked on many death penalty cases, has opined about the loss of these two important mitigation witnesses:





**Exhibit G** (declaration of Susan Garvey ¶¶ 28-32) (**filed under seal**); *see also id.* ¶¶ 2, 39, 51-52 & 55 (discussing other ways that the loss of the two mitigation witnesses has impaired the ability of Mr. Merrell to develop capital mitigation).

Another type of actual prejudice suffered by Mr. Merrell resulting from the government's diametric change in its position about the death penalty is the lost opportunity to have resolved his case with a non-capital plea bargain. If Mr. Merrell and his counsel in 2023 and 2024 had reason to believe that the Department of Justice after the 2024 presidential election would renege on its January 2024 no-seek notice, they would have been strongly incentivized for him to enter into a plea bargain with the government before the election (and, if necessary, Mr. Merrell even could have pleaded guilty to the indictment without a plea agreement, thus precluding the government's ability to seek the death penalty under 18 U.S.C. § 3593(a) and the Double Jeopardy Clause). *See Hynes v. Tomei*, 237 A.D.2d 52, 55 n.1 (N.Y. App. Div. 1997) (discussing a defendant's differing incentives to plea bargain in a case with a capital charge depending on whether the prosecution is seeking the death penalty), *rev'd on other grounds*, 706 N.E.2d 1201 (N.Y. 1998).

As stated in Bernadette Donovan's declaration:



**Exhibit B ¶¶** 14 & 15. *Cf. Constanza-Galdomez*, 2025 WL 1712436, at *12-*13 ("Their counsel have represented that, at least, their decisions regarding . . . plea negotiations would have been different [if they had known the government would renege on the no-seek notice]. This Court accordingly finds that, under these circumstances, judicial estoppel also bars the government from seeking the death penalty.").[25]

Finally, with respect to actual prejudice, Mr. Merrell has been subject to clearly foreseeable, inhumane treatment by the government's attempt to renege on its January 2024 no-

---

[25] Even if a plea bargain could not have been reached in 2023 or 2024, Mr. Merrell – if he had known then that the government would be able to renege on its formal no-seek notice after a change in administrations – would have been incentivized to proceed to trial in 2024 before the new leadership in the Department of Justice could renege on the Department's prior no-seek notice. *Cf. Constanza-Galdomez*, 2025 WL 1712436, at *12-*13 ("Their counsel have represented that, at least, their decisions regarding consenting to speedy trial exclusions . . . would have been different [if they had known the government would renege on the no-seek notice]. This Court accordingly finds that, under these circumstances, judicial estoppel also bars the government from seeking the death penalty.").

seek notice.  Other courts have recognized the psychological harm inflicted on a defendant resulting from the prosecution's mere delay in deciding whether to seek the death penalty (when it ultimately decides not to do so).[26]  The government's deliberate conduct here has inflicted an even more inhumane type of psychological trauma.  *See also Constanza-Galdomez*, 2025 WL 1712436, at *10 ("The anxiety [that the three defendants] have experienced is no doubt significant given the government's abrupt change in position.").

As discussed *infra* in Part III.G., such wanton inhumane conduct by the government violates the Eighth Amendment and should preclude the death penalty.

### b. Presumptive Prejudice

Apart from the actual prejudice that Mr. Merrell's defense has suffered, the government's filing its notice of its intent to seek the death penalty well over four years after the indictment, coupled with its deliberate decision to renege on its prior formal notice that it was not seeking the death penalty, has presumptively prejudiced Mr. Merrell.  *Cf. Doggett v. United States*, 505 U.S. 647, 656-57 (1992).  *Doggett* involved a constitutional speedy trial analysis in a case involving six years of unnecessary pretrial delay caused by the government's negligence in arresting the defendant after his indictment.  The Court presumed that the delay prejudiced the defendant:

> Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial [in a timely manner] occupies the middle ground.  While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. . . .  [S]uch is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows.  Thus, our toleration

---

[26] *See, e.g.*, *United States v. Green*, No. 12-CR-83S, 2018 WL 786185, at *11 (S.D.N.Y. 2018) (in dismissing an indictment on speedy trial grounds, the court noted among other factors the "unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases."), *aff'd sub nom.*, *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019) ("Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees.").

> of such negligence varies inversely with its protractedness, . . . and its consequent threat to the fairness of the accused's trial. . . .  When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review [i.e., six years], . . . and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, . . . nor persuasively rebutted, the defendant is entitled to relief.

*Id.* at 656-58 (citations and internal quotation marks omitted); *see also Constanza-Galdomez*, 2025 WL 1712436, at *10 (citing *Doggett*).

Although the Sixth Amendment's speedy trial clause does not apply to the sentencing phase, *Betterman v. Montana*, 578 U.S. 437, 439 (2016), the *Doggett* Court's reasons for presuming prejudice due to the undue delay in that context likewise support presuming prejudice based on the government's delay in announcing its intent to seek the death penalty in the instant case (particularly coupled with its January 24, 2024 no-seek notice).  Indeed, such a presumption applies even more forcefully here because the government's actions have not merely been negligent, as they were in *Doggett*.  Instead, they have been *deliberate*.

Any counterargument that the current leadership of the Department of Justice cannot be responsible for the actions of the former administration's departmental leadership would contradict the Supreme Court's well-established rule that the acts, statements, and knowledge of one prosecutor are attributable to other prosecutors in the same office.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government.  A promise made by one attorney must be attributed, for these purposes, to the Government.  *See* RESTATEMENT (SECOND) OF AGENCY § 272."); *cf. Santobello v. New York*, 404 U.S. 257, 262 (1971) (attributing one prosecutor's plea-bargain promise to a second prosecutor in the same office who had been unaware of the first prosecutor's promise when the second prosecutor breached the agreement at the defendant's sentencing); *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc) (holding that a promise made by a federal prosecutor

in one judicial district on which a defendant relied is enforceable against a federal prosecutor in a different district).  Although the Department of Justice may change its charging and sentencing policies in a new administration and treat future litigants differently than litigants in past cases, it may not do so in a specific pending criminal case when a prior formal representation was made and its reversal would prejudice that specific defendant. *Cf. United States v. Mendoza*, 464 U.S. 154, 161-62 (1984) (holding that nonmutual offensive collateral estoppel does not apply to the federal government).

### C. This Court Should Strike the Government's July 1, 2025 Notice Because "Good Cause" Does Not Exist for Its Filing.

Assuming *arguendo* that the government's July 1, 2025 notice of intent to seek the death penalty is not untimely under § 3593(a), then § 3593(a) precludes the July 1, 2025 notice for a different reason: the government cannot demonstrate "good cause" for its amendment to its January 2024 no-seek notice.[27]

As an initial matter, it is noteworthy that the government did not move for leave to amend its prior no-seek notice filed pursuant to § 3593(a) notice.  That itself is an independent basis to strike the government's July 1, 2025 notice.  *See Scurlock*, 2025 WL 2025 WL 1360499, *10 (stating that "[t]he Death Notice violates the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3593, because the government never sought leave to amend its July 2024 No-Seek Notice"); *see also id.* at *23 ("Here, to start, the government never sought leave to amend.").  Yet, as discussed below, even if such a request for leave to amend had been made, the government cannot demonstrate "good cause."

---

[27] Section 3593(a) states that a court "may permit the attorney for the government to amend the [death] notice upon a showing of *good cause*." 18 U.S.C. § 3593(a) (emphasis added).

"[T]he § 3593(a) good cause requirement is distinct from the statute's timeliness requirement . . . .  Importantly, *Ferebe* focuses on, and elucidates, the reasonable notice provision of § 3593(a), not the statute's good cause requirement."  *United States v. Le*, 316 F. Supp.2d 343, 348 (E.D. Va. 2004).  "[I]t is clear that § 3593(a) good cause must focus on the diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained. Here, as in other legal contexts, absent reasonable diligence, there can be no good cause."  *Id.* at 348-49.

The "good cause" requirement of § 3593(a) applies when the government initially filed a no-seek notice and later attempts to withdraw that notice with a new one that it changed its mind and now seeks the death penalty.  *Constanza-Galdomez*, 2025 WL 1712436, at *11.  As the court reasoned:

> The statute seems to contemplate a less dramatic change than the one in this case – the true amendment of a pre-existing death notice.  The government insists that the statute does not say anything about a new death notice, even if a change in position, and that the government is not required to have good cause to entirely change its mind.  True, it is a little dismissive to refer to the momentous switch from a formal no-seek notice to a death notice as a mere "amendment."  But the purpose of Section 3593(a) is to ensure that the government can only change its mind regarding a death notice when there is good cause to do so   If Congress is concerned by the lesser, surely it would also be concerned with the greater.  This Court agrees with Defendants that the principles Congress outlined in Section 3593(a) apply equally to this case.

*Id.*  Similarly, as the court in *Spurlock* held:

> [T]he Court agrees with Defendant that [§ 3593(a)] must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so.  Reading the statute to allow reversal of a no-seek notice without good cause, as the government proposes, would run contrary to the fundamental principles of statutory construction and public policy. Under that reading, the government would be required to show good cause to amend a single aggravating factor under 18 U.S.C. § 3593(a)(2), but would be at total liberty to modify its representations in the far more significant manner – where a defendant's rights and a court's resources are most at stake – by deciding at any time, for any reason, to seek the death penalty, after formally declaring the opposite. This interpretation is nonsensical for many reasons, including because reversal of a no-seek decision involves the noticing of

many new aggravating factors, which are clearly the central subject of 18 U.S.C. § 3593(a)(2)'s good cause requirement.

*Spurlock*, 2025 WL 1360499, at *21; *see also United States v. Dangleben*, No. 3:23-CR-0072, 2025 WL 1423842, at *6 n.7 (D.V.I., May 16, 2025) ("Although not directly before the Court, the Court seriously questions whether the Government can amend its 'no-seek' notice without a demonstration of 'good cause.'").[28]

Therefore, regardless of the amount of time remaining before the existing trial date, this Court must determine whether the government can demonstrate "good cause" for reneging on its prior no-seek notice. It cannot do so. The government has had "reliable information"[29] about the relevant facts supporting a potential death penalty prosecution since October 2020, when the criminal complaint was filed. ECF No. 13. Yet it chose not to give notice of intent to seek the death penalty until four-and-one-half years later and, instead, formally notified this Court and the defense that it would *not* be seeking the death penalty in January 2024. The only thing that has changed since then is a change in death penalty *policy* by the Department of Justice – which is not "good cause."

Under all the relevant circumstances, the government did not act diligently. *Spurlock* is instructive. The court held, in finding a lack of good cause, that "[t]he essential facts supporting the current charges and aggravators have been known to the government since the original indictment. . . . " *Spurlock*, 2025 WL 1360499, at *22. For the same reason, the government in

---

[28] Even assuming *arguendo* that the statute's good-cause requirement does not apply to a notice to seek the death penalty filed after a prior no-seek notice was filed, this Court should adopt such a requirement under this Court's supervisory authority.

[29] *United States v. Le*, 316 F. Supp.2d at 347-48.

the present case lacked reasonable diligence in filing its July 1, 2025 notice.  Therefore, "good cause" does not exist to permit the government to amend its January 2024 notice.

### D. The Government's January 2024 No-Seek Notice Affirmatively Waived the Government's Ability to File a Notice Under 18 U.S.C. § 3593(a).

Even assuming *arguendo* that the statute itself (§ 3593) does not prevent the government from seeking the death penalty after filing a contrary, prior notice of intent not to seek the death penalty, the government's formal no-seek notice affirmatively and irretrievably *waived* its ability to seek the death penalty under § 3593.  The Supreme Court has explained that "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. *United States v. Olano*, 507 U.S. 725, 733 (1993) (noting that "forfeiture is the failure to make the timely assertion of a right," while "waiver is the intentional relinquishment or abandonment of a known right").  Both the government and criminal defendants are subject to the waiver doctrine. "[W]hat is sauce for the defendant's goose is sauce for the government's gander." *United States v. Caraballo-Cruz*, 52 F.3d 390, 393 (1st Cir. 1995) (referring to waiver).  *See, e.g.*, *United States v. Perkins*, 108 F.3d 512, 516 & n.15 (4th Cir. 1997) (applying the same forfeiture/waiver analysis to a claim of error asserted by the government for the first time on appeal as the court applies to a claim raised by a defendant for the first time on appeal); *see also Eberhart v. United States*, 546 U.S. 12, 19 (2005) ("Here, where the Government failed to raise a defense of untimeliness until after the District Court had reached the merits, it forfeited that defense.").

Section 3593(a) creates not only a "prophylactic right" for a potential capital defendant but also corresponding specific procedural requirements that the government must satisfy in order to seek the death penalty against a defendant.  *See United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003).  The government's formal statement in a court filing that it does not intend to satisfy those procedural requirements operates as an irrevocable waiver of the government's ability in the

future to seek to satisfy those procedural requirements. *Cf. United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing the requirement that two counsel – including one "learned counsel" – be appointed in a capital case, 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added).

"Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' . . .  But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020) (citations omitted); *see also Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government").

Therefore, the government's formal no-seek notice waived the government's ability thereafter to seek to satisfy the requirements of § 3593(a).

### E.  The Government Is Estopped from Filing a Notice that It Intends to Seek the Death Penalty Under 18 U.S.C. § 3593(a).

In addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the government is estopped from doing so.  There are at least three different types of estoppel that apply here – judicial estoppel, equitable estoppel, and promissory estoppel.

### 1.  Judicial Estoppel

For essentially the same reasons that the district courts gave in applying the judicial estoppel doctrine in *Constanza-Galdomez* and *Spurlock*, this Court should hold that the government is judicially estopped from seeking the death penalty in the instant case.

As the court stated in *Constanza-Galdomez*:

The Supreme Court laid our three factors for courts to consider in *New Hampshire v. Maine*, 532 U.S. 742 (2001): (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) a court must "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) a court must ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

All three of those factors favor applying judicial estoppel here. A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not. This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration. . . . Finally, and most concerning to this Court in this case, allowing the government to reverse course would impose an unfair detriment on the defense.

*Constanza-Galdomez*, 2025 WL 1712436, at *12; *see also Spurlock*, 2025 WL 1360499, at *17 (alternatively applying the judicial estoppel doctrine "as a standalone basis" to prevent the government from seeking the death penalty after initially filing a no-seek notice).

This Court should reject any argument by the government that its change in position was in good faith. "The government cannot play 'fast and loose' with decisions involving life and death." *Constanza-Galdomez*, 2025 WL 1712436, at *13; *accord Spurlock*, 2025 WL 1360499, at *20.

This Court should reach the same conclusion in Mr. Merrell's case as the other two district courts did. First, the government's July 1, 2025 notice is diametrically contrary to the government's prior no-seek notice. Second, this Court relied on the government's no-seek notice and its express invitation to schedule a non-capital trial – which this Court did by scheduling a non-capital trial for February 18, 2025, and by managing this case and arranging this Court's calendar (and working with court staff) in reliance on that non-capital trial date. *See* ECF No. 263 (February 27, 2024 scheduling order). *Cf. Spurlock*, 2025 WL 1360499, at *18 ("The Court has . . . adopted and relied on the July 2024 No-Seek Notice in . . . explicit and implicit ways, many of

which the Court has already discussed, throughout the eight months since that decision, including

by clearing its calendar [during the trial dates], [and] . . . addressing pretrial timing and motions

with a scheduled non-capital trial in mind . . . ."); *accord Constanza-Galdomez*, 2025 WL 1712436,

at *12 ("A notice of intent to seek the death penalty is the direct opposite of the prior statement by

the government that it would not.  This Court effectively accepted that statement in managing this

case as a non-capital RICO case for its duration.").

Third, the government clearly would derive an unfair advantage and it would impose an

unfair detriment on the defense if the government is not estopped from seeking the death penalty,

as discussed *supra* at Part III.B.5.  *See Spurlock*, 2025 WL 1360499, at *18.

Therefore, the government should be estopped from seeking the death penalty.

## 2.  Equitable Estoppel

"To establish equitable estoppel it is not necessary that actual fraud be shown.  It is only

necessary to show that the person estopped, by his statements or conduct, misled another to his

prejudice."  *United States for Use and Benefit of Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir.

1938); *accord United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and

Casualty Co. of New York*, 402 F.2d 893, 897 (4th Cir. 1968).

"As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just

operation of judicial proceedings, counsel must be able reasonably to rely on representations made

by fellow counsel in the context of litigation."  *Miranda v. Contreras*, 754 A.2d 277, 281 (D.C.

App. 2000).  Based on the government's formal representation made in its January 2024 no-seek

notice, this Court should apply the equitable-estoppel doctrine as well as the related but distinct

judicial-estoppel doctrine.  Clearly, when the government filed its no-seek notice, Mr. Merrell and

his defense team were misled into believing that the death penalty was off the table and thereby relied to their detriment.

Finally, the reasonableness of Mr. Merrell's defense counsel's detrimental reliance on the no-seek notice is underscored by the provisions in the *Justice Manual*,[30] which show that the Department of Justice has long believed that such notice is required by § 3593(a) when the Department decides not to file a notice to seek the death penalty in a given case. And the *Justice Manual* also explicitly and repeatedly states that a no-seek notice reflects a "final decision" by the Department. As an objective matter, the January 25, 2024 no-seek notice gave the defense good reason to believe that the government would not change its formal position.

### 3. Promissory Estoppel

The government's July 1, 2025 notice also should be barred under the promissory-estoppel doctrine. The elements of promissory estoppel are (1) a clear and definite promise; (2) where the

---

[30] The *Justice Manual* provides in pertinent part that:

**9-10.030 - Purposes of the Capital Case Review Process**

The review of cases under this Chapter culminates in a decision to seek, ***or not to seek***, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. . . .

\*\*\*

**9-10.150 - Post-Decision Actions**

. . . The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the **final decision** [one way or the other]. Expeditious communication is necessary ***so that the court is aware***, ***in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty***, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required. In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel should be given as much opportunity as possible to make proper scheduling decisions.

Justice Manual §§ 9-10.030 & 9-10.150 (emphasis added).

promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979).

The government's no-seek notice was a "clear and definite promise" that the government would not seek the death penalty; the government had a reasonable expectation that Mr. Merrell and his defense team would rely to their detriment on that promise; Mr. Merrell and his defense team did so rely to their detriment on the no-seek notice for 17 months; and the only manner to avoid this detriment is to enforce the government's promise.[31]

A "promise" is "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Brown v. New York City Dept. of Educ.*, 755 F.3d 154, 165 (2d Cir. 2014) (defining as "promise" as "a declaration that one will do or refrain from doing something specified") (*quoting Webster's Third New International Dictionary* 1815 (1986)). The government's formal notice – "Notice of Intent Not to Seek the Death Penalty" – specifically stated that the Attorney General has "direct[ed] the Government not to seek the death penalty against Monroe Merrell . . . ." ECF No. 253. That statement clearly qualified as a "promise" because it was a clear manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Merrell and his defense team were entirely

---

[31] That fact that there was no "consideration" (or mutuality of obligation) does not foreclose the application of the promissory estoppel doctrine. *See, e.g., Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 824 (2d Cir. 1994) (discussing the history of the promissory estoppel doctrine in the United States); *see also Cunningham Energy, LLC v. Vesta O&G Holdings, LLC*, 578 F.Supp.3d 798, 811-12 (N.D. W. Va. 2022) (discussing promissory estoppel doctrine under West Virginia law); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981). Indeed, by definition, the promissory estoppel doctrine applies when there is lack of consideration or lack of mutuality or for any other reason that precludes an action for breach of contract but where a party has detrimentally relied on another party's promise. *Merex A.G..*, 29 F.3d at 824.

justified in understanding that an irrevocable *commitment* not to seek the death penalty had been made.  This is particularly true in view of the *Justice Manual* provisions quoted *supra* and the fact that the Department of Justice previously had treated its no-seek notices as permanent.

***

For these reasons, the government should be estopped from seeking the death penalty.

### F. Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause.

Failure to enforce the government's promise would not only result in a severe inequity; it also would violate due process.  *Cf. Santobello*, 404 U.S.at 262 (". . . [A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

Furthermore, the government's "arbitrary and capricious"[32] conduct in this case – delaying the filing of a notice that it was seeking the death penalty by four-and-one-half years from the time of the indictment, coupled with initially having given formal notice that it would *not* seek the death penalty and then reneging on that representation 17 months later – "shocks the conscience" and, thus, violates due process.  *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (noting that the "kind of executive conduct that fairly can be said to 'shock the conscience' . . . and be 'fatally arbitrary in the constitutional sense' . . . involves 'abusing [executive] power, or employing it as an instrument of oppression'"); *see also Shaffer v. Heitner*, 433 U.S. 186, 212 (1977) (due process violated when the conduct of the government "offends traditional notions of fair play and substantial justice").

---

[32] *United States v. Littrell*, 478 F. Supp.2d 1179, 1192 (C.D. Cal. 2007) (striking the government's "arbitrary and capricious" notice of its intent to seek the death penalty as a violation of due process).

42

Finally, the circumstances in this case also violate due process in a third way: the government's unjustifiable, prejudicial delay in seeking the death penalty, particularly after initially explicitly announcing that the government would not seek it, has substantially and irreparably prejudiced Mr. Merrell's ability to defend at a capital trial (including, most significantly, at the capital sentencing phase). *Cf. Betterman v. Montana*, 578 U.S. at 448 n.12 ("For inordinate delay in sentencing, although the Speedy Trial Clause does not govern, a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments. . . . Relevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice.").

### G. Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause.

It also would violate the Eighth Amendment to permit the government to seek the death penalty in view of its prior explicit waiver 17 months before it abruptly changed its position last month. What the government has done is both *cruel* (indeed, inhumane) and certainly *unusual*.[33] Such conduct, at the very least, "wantonly"[34] inflicts psychological trauma in violation of the Eighth Amendment. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Beal v. Foster*, 803 F.3d 356, 357-38 (7th Cir. 2015) (holding that the Eighth Amendment prohibits unjustified

---

[33] Before the recent policy of the DOJ to reconsider capital cases in which the previous administration had formally disclaimed its intent to seek the death penalty, the DOJ had never engaged in such a diametric change in position.

[34] *Cf. State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1949) (plurality) (finding no constitutional violation when a convicted capital defendant initially was unsuccessfully electrocuted as a result of an "unforeseeable accident" and thereafter subject to a second execution date; reasoning that there was no "add[ed] . . . element of cruelty" in the subsequently scheduled execution). What occurred in the present case was not an "unforeseeable accident." It was a *deliberate* decision by the Department of Justice.

infliction of physical *or* psychological pain; citing *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012)).

## CONCLUSION

The legal dispute at issue is not merely about a violation of Mr. Merrell's rights.  Instead, "[a]t stake is the honor of the government [and] public confidence in the fair administration of justice . . . ."  *Carter*, 454 F.2d at 428 (4th Cir.) (en banc).  As so aptly stated by the court in *Constanza-Galdomez*:

> This case presents an unusual and extreme situation because the government has directly contravened its prior representations to the Defendants and this Court. The government asks this Court to treat its belated attempt to seek the death penalty like any other change in a charging document.  This Court [should] not cast aside decades of law, professional standards, and norms to accommodate the government's pursuit of its agenda.  Of course, elections have consequences, and this administration is entitled to pursue the death penalty in cases where it can do so in accordance with constitutional and statutory requirements.  But this is not one of them.

*Constanza-Galdomez*, 2025 WL 1712436, at *10.

The Supreme Court has long held that courts "'as much as is humanly possible'" should take "'extraordinary measures" to ensure that persons charged with capital offenses and facing the prospect of the death penalty be afforded a judicial process "that will guarantee . . . that the sentence was not imposed out of whim, passion, prejudice, or mistake.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring)).  Permitting the prosecution to seek the death penalty at the February 2, 2026 trial clearly would run afoul of this fundamental requirement.

For the foregoing reasons, this Court should strike the government's July 1, 2025 notice with prejudice.  If the government disputes any of the factual assertions made in this motion and its exhibits, Mr. Merrell requests an evidentiary hearing.

Respectfully submitted,

*/s/ Douglas Sughrue*

Douglas Sughrue
Sughrue Law
Suite 501
429 Fourth Avenue
Pittsburgh, PA 15219
412-391-1629
Fax: 412-391-1622
dsughrue@sughruelaw.com

James A. Swetz
*Admitted Pro Hac Vice*
2312 Wilton Dr.
Suite 23
Wilton Manors, FL 33305
954-800-6450
jaswetz@jaswetzlaw.com

Brent E. Newton
*Admitted Pro Hac Vice*
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
brentevannewton@gmail.com

**Counsel for Defendant Monroe Merrell**

### CERTIFICATE OF CONFERENCE

On August 4, 2025, the government filed a motion requesting a scheduling order governing the filing of this motion to strike the government's July 1, 2025 notice and the government's response thereto, which indicates government's position that it opposes the relief sought by this motion.

*/s/ Douglas Sughrue*
Douglas Sughrue


### CERTIFICATE OF SERVICE

On August 6, 2025, I emailed a copy of this sealed motion and its exhibits to counsel for the government, Assistant U.S. Attorney Kimberley D. Crockett at Kimberley.D.Crockett@usdoj.gov.

*/s/ Douglas Sughrue*
Douglas Sughrue